[691 NYS2d 4]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v PAUL
RIVERA, Appellant.

First Department, April 22, 1999

## APPEARANCES OF COUNSEL

*Rona Feinberg* of counsel (*Sylvia Wertheimer* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for respondent.

*Matthew B. White* of counsel (*Cravath, Swaine & Moore, Schulte Roth & Zabel, L. L. P.,* and *Risa Gerson, Office of the Appellate Defender,* attorneys), for appellant.

## OPINION OF THE COURT

WILLIAMS, J.

During the period from August to December 1995, the New York City Police Department ran an undercover drug investigation of the sale of "Good Job" brand heroin in the area of 136th Street and Amsterdam Avenue. The undercover officer acting as the drug purchaser made 13 purchases of "Good Job" in the course of the investigation. Each transaction was recorded on both videotape and audiotape. The operation resulted in the arrests in January 1996 of defendant and 11 of his cohorts on a 15-count indictment charging them with criminal sale of a controlled substance and conspiracy; all but one of them was convicted.

The charges against defendant arose from a transaction which took place on December 5, 1995 at approximately 11:35 A.M. The undercover officer, wearing a transmitter which fed audio to the video camera recording the transaction, approached defendant who was standing in front of an apartment building at 508 West 136th Street. Defendant asked the undercover what he wanted, and the undercover replied that he wanted "50". After reassuring defendant that he was not a

police officer, the undercover asked for one of the codefendants, Enrique Serra, with whom he had engaged in transactions before. "Good Job" was mentioned twice, at least once by defendant, and defendant then stated that he would have to contact Serra by beeper. Defendant then proceeded to the corner of 136th Street and Amsterdam Avenue to use the pay phone there. Upon his return, he advised the undercover officer that he had beeped Serra, who was on his way. After about five minutes, a gray van pulled in front of 508 West 136th Street. Serra and a man he introduced as his bodyguard emerged from the van, greeted the undercover, and began negotiating with him regarding a drug transaction. Defendant departed the scene soon after Serra arrived and was not present at the subsequent drug transaction, where the undercover purchased $5,000 worth of "Good Job".

The evidence against defendant at trial consisted of the undercover's testimony as stated above, followed by the December 5, 1995 videotape of that transaction. The videotape also included, subsequent to the transaction with the undercover, defendant apparently engaging in at least one more transaction as well as a conversation with Serra. Two codefendants testified that defendant acted as a "pitcher" for the "Good Job" brand and that they had observed him conduct sales.

At the point in the trial when the People indicated that they wished to use the December 5, 1995 tape, the defense requested an audibility hearing with defendant present at the hearing. The court granted the hearing, but excluded defendant and the five codefendants with whom he was tried, citing the problem of security logistics with the numerous defendants involved as well as his view that the audibility determination was purely legal, such that defendant's presence was unnecessary. The tape had previously been provided to the defense and had been reviewed by defense counsel.

The court reviewed the tape, noted that its audibility was problematic, but nevertheless admitted it into evidence on the basis that the relevant dialogue was brief, that there were three to four interactions between the undercover and defendant, and that the defendant was "heard to speak words that are audible words that have some significance". The court found that the "inaudible language does not permit the jury to speculate unfairly [as] to Mr. Rivera and in favor of the People's case". Counsel took no further objection to the court's ruling that the defendant not be present nor did he advise that he had not reviewed the tape with defendant when it was in his

possession, defendant's attorney being content to only object to the poor sound quality of the tape.

■ The major issues presented by this appeal are whether defendant's absence from the audibility hearing constitutes reversible error, and whether it was an abuse of the trial court's discretion to admit the partially inaudible videotape into evidence. Since defendant's attorney had previously received the tape and had a chance to review the tape with defendant, excluding defendant from the audibility hearing was not error, inasmuch as the hearing was strictly confined to the tape's audibility qualities, which admission was well within the discretion of the court. In addition, defendant was present in court when the tape was played and heard the testimony with regard to the tape. At no time did he offer an objection to what was contained in the tape.

A New York defendant's right to be present at material stages of trial is grounded in the Confrontation and Due Process Clauses of the United States and New York Constitutions as well as in CPL 260.20 (*People v Sprowal*, 84 NY2d 113, 116-117). The constitutional guarantees extend to "core" proceedings, which, pursuant to the Confrontation Clause, have been defined as stages "where witnesses or evidence against [defendant] are being presented to the trier of fact", and pursuant to the Due Process Clause, as stages where the defendant's presence might impact his ability to defend himself at a critical stage of the criminal proceeding (*supra,* at 117; *Kentucky v Stincer*, 482 US 730, 744-746). The statutory guarantee is broader and encompasses the right to be "personally present during the trial of an indictment" (CPL 260.20). This right includes certain of the so-called "ancillary" proceedings as well as all core proceedings (*People v Morales,* 80 NY2d 450, 455-457).

Ancillary proceedings that have been held to require the defendant's presence include those wherein the defendant's presence may be useful because he has special knowledge about the facts at issue or is capable of making a valuable contribution, such as *Ventimiglia* hearings (*People v Spotford,* 85 NY2d 593), *Sandoval* hearings (*People v Dokes,* 79 NY2d 656), or voir dire of prospective jurors (*People v Sprowal,* 84 NY2d 113, *supra*; *People v Sloan,* 79 NY2d 386). Proceedings where the issue is a legal one, such as bench conferences concerning the stipulation of the contents of a medical record or setting up the remainder of the trial schedule or a motion for a trial order of dismissal, do not require the defendant's presence (*People v*

*Velasco,* 77 NY2d 469). The key concern under the statutory guarantee is "the effect that defendant's absence might have on the opportunity to defend" *(People v Morales, supra,* at 456).

Although the matter presents an issue novel to New York appellate courts, an audibility hearing would appear to be an ancillary proceeding which often will not require the defendant's presence. An audibility hearing addresses the preliminary issue of whether the utterances on a tape are sufficiently clear and understandable to be admissible into evidence at trial, a determination within the sound discretion of the court *(see, People v Mitchell,* 220 AD2d 813, *lv denied* 87 NY2d 905; *People v Watson,* 172 AD2d 882; *United States v Bryant,* 480 F2d 785 [2d Cir]; *United States v Arango-Correa,* 851 F2d 54 [2d Cir]; *In re Audibility of Certain Recorded Conversations,* 691 F Supp 588). The court's discretion is broad in deciding audibility and such discretion includes who is to be present at the hearing and the procedure to be followed; under certain circumstances even counsel may be excluded. Prudential matters such as judicial economy or security considerations may be the basis of such a determination *(see, In re Audibility of Certain Recorded Conversations, supra,* 691 F Supp, at 596-599).

In making its determination, the court must weigh the probative value of the tape against the potential for prejudice, and "[a] recording must be excluded from evidence if it is so inaudible and indistinct that a jury must speculate as to its contents" *(People v Harrell,* 187 AD2d 453, *lv denied* 81 NY2d 789). Absent the likelihood of such speculation, a tape may be admissible even where it contains inaudible and/or unviewable segments *(People v Harrell, supra).* This standard is applied so as to favor admissibility, that is, a recording is admissible unless found disqualified due to inaudibility or due to prejudice outweighing its probativeness *(see, United States v Arango-Correa,* 851 F2d 54, 58, *supra; United States v Bryant,* 480 F2d 785, 790, *supra).* "Probative" in this context means that the tape is sufficiently audible such that the jury may learn something relevant from it as opposed to merely speculating about what it contains *(In re Audibility of Certain Recorded Conversations, supra,* at 603).

This determination is markedly different from those in the ancillary proceedings cited above. An audibility hearing is a threshold proceeding where the court is determining admissibility on a preliminary basis *(In re Audibility of Certain Recorded Conversations, supra; People v Rostick,* 244 AD2d 768, *lv*

*denied* 91 NY2d 929; *People v Mitchell*, 220 AD2d 813, *lv denied* 87 NY2d 905, *supra*). Given the qualitative nature of the "audibility" determination, once the defense has had an opportunity to apprise the court of its contentions on the issue, there is little that either counsel or defendant can add during the court's actual review of the tapes; hence the court, in proper circumstances, may choose to do so outside of one or both of their presence (*see, In re Audibility of Certain Recorded Conversations, supra* at 598). The nature of an audibility determination is such that it usually involves no witnesses at all, i.e., requires no taking of additional evidence and no cross-examination (*supra,* at 599). Thus, the court's determination at the audibility hearing is usually based on no other factfinding than its own qualitative evaluation of the aural quality of the tape and, in most cases, the defendant's absence will have no effect on his ability to defend.

Consequently, an audibility hearing is distinguishable from the proceedings in cases such as *People v Spotford* (*supra*) and *People v Dokes* (*supra*), which sought to determine the admissibility of evidence of prior crimes against those defendants and involved factual issues that those defendants could be of assistance in resolving, such as the accuracy of a criminal history sheet or details as to the underlying facts regarding charged or uncharged misconduct. Also distinguishable is the proceeding in *People v Turaine* (78 NY2d 871), a determination whether to admit evidence that a defendant had threatened a witness, an issue where defendant's presence and participation could be of value, unlike the audibility hearing at bar. Defendant's reliance on *People v Shields* (82 Misc 2d 275) and *People v Di Matteo* (80 Misc 2d 1029) is also inapposite; although audibility "hearings" were mentioned in each case, the real issue was pretrial disclosure to defendants of audiotapes that the People were considering introducing into evidence. Justice Titone held in each case that the defendants had to be provided the tapes prior to trial to avoid any "tactical advantage" for the People. Disclosure of the tape is not an issue here, since defendant was provided with the videotape in advance of trial and had ample opportunity to review it.

Two other cases, *People v Arroyave* (63 AD2d 127, *mod on other grounds* 49 NY2d 264) and *People v Stevens* (221 AD2d 937, *lv denied* 88 NY2d 854), relied upon by defendant in the absence of New York authority holding that an audibility hearing is a "material stage of trial" for which a defendant has the right to be present, may also be distinguished. *Arroyave*'s mere

mention of defendant's presence at the audibility hearing there does not amount to recognition of a requirement that he be present. Nor is *Stevens* authority for the proposition that an audibility hearing where a defendant's own statements are at issue is a "material stage of trial" requiring his presence. In *Stevens*, the Court rejected the defendant's assertion that he was denied his right to be present at a material stage of trial when he was absent from an audibility hearing for audiotapes of a codefendant conversing with a third party. Defendant relies on the Court's rationale, that defendant Stevens had no " 'peculiar knowledge that would be useful in advancing defendant's or countering the People's position' " (*supra*, at 937) because he was not a witness to the conversations taped, as implying that had Stevens had any such knowledge, his presence would have been required at the hearing. This conclusion is unwarranted, since the issue of a defendant's right to be present where his statements are the subject of the audibility hearing was not squarely before the Court, and had it been, the issues and the Court's analysis would not necessarily have been the same.

Hence, a defendant's presence at an audibility hearing would appear to be a matter within the court's sound discretion, with due regard for a defendant's right to be present when his ability to defend is at issue, and not an across-the-board requirement.

As noted previously, the determination as to whether audiotaped utterances are sufficiently clear and understandable to be admitted into evidence lies within the sound discretion of the court. If a recording is so unintelligible that the jury will be forced to speculate as to its contents, it must be excluded from evidence; however, if the likelihood of speculation is eliminated, the recording may be admissible although it contains inaudible or unviewable segments (*People v Harrell*, *supra*).

█ The court herein did not improvidently exercise its discretion in admitting the videotape into evidence. By all accounts, despite the inaudibility of portions of the tape, key portions were sufficiently audible such that when heard in combination with the excellent quality video, the jury need not have speculated about what had transpired. Moreover, at trial the tape accompanied the aforementioned testimony of the trained undercover officer and the two codefendants which served to corroborate the significance of the events on the tape.

The assertion that the inaudibility, i.e., inadmissibility, of the tape is reflected in the fact that no transcript of the tape

was made is without merit. Of the 13 tapes presented by the prosecution, only three were transcribed. Also there is nothing in the record to indicate that this tape was not transcribed due to any inaudibility of the dialogue between defendant and the undercover officer.

The above notwithstanding, even if it is assumed that admitting the videotape into evidence was error, the error was harmless here, given the quantum and quality of the additional evidence demonstrating defendant's guilt (*see, People v Crimmins,* 36 NY2d 230, 241-242; *People v Bazelais,* 98 AD2d 802, *lv denied* 62 NY2d 617). Here, even without the evidence of the videotaped transaction at issue, there was a wealth of evidence sufficient to convict defendant. The eyewitness testimony of the undercover officer sufficiently established that defendant was an active participant in the conspiracy to sell "Good Job" heroin in the time frame and at the location under investigation and that he was a participant in the December 5, 1995 transaction. Once the undercover officer approached defendant to buy drugs, defendant's conduct was totally given over to facilitating the sale and safeguarding the conspiracy from police infiltration: he summoned Serra by beeper, waited with the undercover until Serra arrived, and questioned the undercover's bona fides as a customer several times. The testimony of codefendants Algarin and Guillermo identified defendant as a "pitcher" for "Good Job" who worked between the hours of 7:00 A.M. and noon, to whom both had spoken about his sales of heroin, and whom they had observed conducting sales. In addition, at trial, Algarin identified defendant as the person shown on the December 5, 1995 videotape apparently engaging in at least one drug transaction subsequent to the one at issue.

Finally, upon review of defendant's contentions concerning the court's supplemental charge, we find them to be without merit.

Accordingly, the judgment of the Supreme Court, New York County (Edward McLaughlin, J.), rendered November 1, 1996, convicting defendant, after a jury trial, of one count of criminal sale of a controlled substance in the second degree and one count of conspiracy in the second degree, and sentencing him, as a second felony offender, to concurrent terms of 8 years to life and 4½ to 9 years, respectively, should be affirmed.

ROSENBERGER, J. P. (dissenting.) I respectfully dissent. Since I believe that the audibility hearing was a material stage of

the proceedings at which defendant had a right to be present under CPL 260.20 (*see*, *People v Cain*, 76 NY2d 119, 121 [harmless error analysis inapplicable to denial of right to be present]), the judgment should be reversed and the matter remanded for a new trial. Although defense counsel made no further objection once his request concerning defendant's presence was denied, the issue is preserved for our review because under CPL 470.05 (2), a party who unsuccessfully seeks a particular ruling is deemed to have protested the court's disposition of the matter.

The majority acknowledges that this appears to be an issue of first impression for New York State courts. For the following reasons, our precedents and the policy behind CPL 260.20 do not logically support the majority's absolute rule that an audibility hearing can never be a material stage of the trial. It seems clear, at least under the circumstances of this case, that defendant had the right to be present. Given that only he and the undercover knew the facts surrounding the videotaped incident, defendant should not have been denied the opportunity to elucidate or contradict the court's interpretation of the words spoken by defendant on this barely audible tape.

While our courts have not directly addressed this question, New York case law implicitly supports the defendant's right to attend an audibility hearing, at least when the disputed tape contains his own statements (*compare*, *People v Stevens*, 221 AD2d 937, *lv denied* 88 NY2d 854 [audibility hearing not material stage of proceedings for defendant who neither took part in nor witnessed taped conversations]). Certainly, the majority has not cited, nor can we discover, any New York State case denying a defendant the right to be present at an audibility hearing concerning a tape containing his statements. To the contrary, numerous cases mention a defendant's active participation in such hearings (*e.g.*, *People v Arroyave*; 63 AD2d 127, 130, *mod on other grounds* 49 NY2d 264; *People v Hochberg*, 87 Misc 2d 1024, 1032, *affd* 62 AD2d 239). True, these cases do not go so far as to say that the defendants had a right to be present. However, they do undermine the majority's conclusion that a defendant would never have anything meaningful to contribute to an audibility determination.

The majority cites *In re Audibility of Certain Recorded Conversations* (691 F Supp 588, 596-599) for the proposition that not even defense counsel, let alone a defendant himself, has the right to attend an audibility hearing. Federal cases such as this are of interest, but hardly controlling, because the right to

be present at material stages of the trial is broader under New York law than under Federal law.

In determining whether a defendant has the right to attend a pretrial hearing, the "key factor is whether the proceeding involved factual matters about which defendant might have peculiar knowledge that would be useful in advancing the defendant's or countering the People's position" (*People v Dokes*, 79 NY2d 656, 660). The majority's conclusion that the audibility of the tape was a purely discretionary matter for the Trial Judge is both illogical and inconsistent with well-settled precedents involving a defendant's right to attend other pretrial proceedings.

For instance, a defendant must be allowed to attend voir dire (*People v Antommarchi*, 80 NY2d 247) and *Sandoval* hearings on admissibility of a defendant's prior bad acts (*People v Dokes, supra*, at 660). In both these situations, as in an audibility hearing, the ultimate question to be answered is a legal question, such as whether the proffered evidence is more prejudicial than probative. However, this legal conclusion necessarily depends on the resolution of disputed factual issues. For this reason, our courts give the defendant the opportunity to contribute his version of the facts (*People v Dokes, supra*, at 661 [defendant's presence at *Sandoval* hearing helps ensure that court's decision will not turn on prosecutor's unrebutted view of the facts]). By contrast, it was not considered necessary for a defendant to be present at a precharge conference concerning the scheduling of the rest of the trial and the court's proposed concluding instructions to the jury, since these were purely "questions of law or procedure" (*People v Velasco*, 77 NY2d 469, 472).

Nothing could be more fact specific than the audible reliability of a particular tape that is being offered as an accurate record of a defendant's incriminating words and behavior. Significantly, in *People v Stevens (supra)*, the Court deemed the defendant's presence at the audibility hearing unnecessary, *not* because the hearing solely involved questions of law, but because he had no personal knowledge of the events on the tape and thus could not offer an informed alternative to the People's position. This reasoning indicates that an audibility hearing is a factual inquiry to which a defendant could meaningfully contribute, where, as here, he *was* personally involved in the recorded interaction. In their brief, the People tacitly concede the relevance of a participant's explanatory testimony to audibility when they claim that any ambiguity in

the tape was dispelled by the undercover officer's trial testimony.

The People maintain that the issue at the hearing is not the *accuracy* of what was said, but merely whether the tape was sufficiently audible for the jury to be able to comprehend it without undue speculation. This distinction makes no sense at all. The words on a tape might seem unambiguous to the court until a participant plausibly suggests that he actually said different but similar-sounding words. A tape should not be deemed "audible" merely because a nonparticipant listener can easily jump to the wrong conclusion. One may be "speculating" without realizing it. The legal conclusion that the tape is sufficiently "audible" to be played for the jury rests on the uniquely factual determination that the tape would give the listener an accurate impression of events (*see, United States v Murgas*, 967 F Supp 695, 709 [in context of audibility hearing, stating that "(t)ape recordings generally are admissible upon a showing of authenticity, accuracy, and relevance"]). Given that many of the words on this tape are indistinct or sound like other words, and that sometimes one cannot tell who is speaking crucial phrases, it was reversible error for defendant to be denied the right to be present at this material stage of the proceeding and the opportunity to help the court assess the accuracy of the tape. Since harmless error analysis does not apply here, the legal effect of the erroneous ruling is not mitigated, as the majority suggests, by the fact that defendant had other opportunities to hear the tape and to attack it at trial.

NARDELLI and RUBIN, JJ., concur with WILLIAMS, J.; ROSENBERGER, J. P., dissents in a separate opinion.

Judgment, Supreme Court, New York County, rendered November 1, 1996, affirmed.